Good morning, Your Honors. May it please the Court, Jessica Ellsworth for Appellants. Integra Med Analytics obtained claims data from CMS, performed a self-described unique analysis, and filed suit, accusing the Providence Hospital Defendants and Integra, excuse me, the Providence Hospital Defendants and JADA, a company that assists with their clinical documentation program of fraud. Specifically, Integra says they submitted Medicare claims that fraudulently included three diagnoses that the patient's actual medical condition did not warrant. By their second amended complaint, Integra had cut and pasted some allegations from the Internet on websites about clinical documentation, and it had added a handful of statements describing interviews with unidentified individuals, none of which related to Providence coding these three diagnoses when not warranted by patient's conditions. Counsel, correct me if I'm mistaken, but I thought that the JADA business practices data were not on the news, if you will. It didn't come from the government. They were more proprietary. If we find that part of the information relied upon by Providence was in the news and part was not, that does not disqualify the lawsuit, does it, on that point? That's correct, Your Honor. This court would then perform the analysis from Metesky, described in Metesky, where it would compare the information that was publicly disclosed to the allegations in the relator's complaint and what the court found in Metesky was that there the relator's allegations discussed specific issues that could not be found in the publicly disclosed information. Here, the data alone that CMS provided to Integra and Integra analyzed, I think is a sufficient basis for this court to find the bar applies. And that's because Integra itself, in its complaint, repeatedly describes the data as what gave it an indication of fraud. It says that in multiple paragraphs of its complaint. So if Integra itself has told the court that the basis for its fraud allegation is the data alone, then that alone would be a sufficient basis to apply the public disclosure bar. The public disclosure bar is one of two issues that are before this court. The other is 8A and 9B. I'm happy to take them in either order that the court prefers. Let me ask you about 8A, the plausibility standard, if I could, Ms. Ellsworth. Plaintiffs here submitted a 100-page complaint that seems to tell a story that Providence is systematically billing these MCC codes at rates higher than the peer hospitals. So I guess what is your best argument that fraud isn't a plausible explanation here? So, Your Honor, I think there are two arguments that I would point to. The first is the one that the Fifth Circuit relied on in the Baylor decision because Providence was not the only hospital targeted by Integra with its analysis of Medicare claims data. And in a virtually identical complaint that was filed against Baylor and the dismissal was affirmed by the Fifth Circuit, the Fifth Circuit explained that these facts have an equally obvious alternative explanation, which is that the defendant was ahead of the curve at coding. And the context matters here. When CMS moved to this particular payment system for inpatient hospital stays for Medicare patients, it expressly encouraged hospitals to adopt clinical documentation practices. And the reimbursement that flows to a hospital depends on how thoroughly they document the severity of a patient's illness. Together, counsel, and this is my understanding as well, you're saying the question is not whether the allegation could reflect an unlawful practice, but if it could also reflect a lawful practice, that basically protects, in this case, Providence. Is that correct? That's right, Your Honor. And that comes from the Supreme Court's decisions in Twombly and Iqbal. It's what Baylor relied on. This Court has similarly. But Ms. Elsworth, and I get that. I appreciate it because it's like if two are possible, there's two possibilities and one is lawful, then that's significant. I guess my question is, what if both explanations, that there may be fraud and Providence is better at coding, are equally plausible? Should we not allow the complaint to go forward? So, Your Honor, what this Court said, and I would point it to a case that isn't cited in the briefs, but I'd be happy to provide after argument if you'd like to see it. In the Eclectic Properties v. Marcus and Millichap case, the site is 751 F. 3rd, 990 at 995 to 997. It's from 2014 from this Court. The Court explained that when there are two possible explanations consistent with the facts alleged, the plaintiff needs to identify, quote, something more to move across the line from possible or conceivable to plausible. Something showing that the other possible explanation is less likely to be true. If I could use an analogy, if my athletes run faster than everybody else's, it's possible that they're doping or it's possible that they're just better or harder working. And that would be similarly both possible, but in order to claim fraud, you would have to do something more. Isn't that kind of the same argument on your side? That is, Judge Boggs. We think that's exactly right, and they didn't do that something more. But am I right that here their statistical analysis did, at least plausibly, allege that it isn't just chance that your coding is at the very high end. Obviously, any disparate activity is going to have some spread, but your argument is not that we just happen to be at the top. It's that we happen to be better. If you want to say better, more accurate, more aggressive, fully within the bounds of the law. I mean, you can see that you're at the high end. Is that fair? We can see that on the unique analysis that they have done of a tiny subset of principal diagnosis codes, they say that we are on the high end, yes. Obviously, it's possible that there could be others that you're at the low end, but we just don't happen to know about that. Right. Your Honor, I would point out, though, it's important to think about what the high end means here. And just to give you a concrete example of what I mean, if you look at Table 8 of their complaint, which is at page ER892, it's a column, it's a chart for the severe malnutrition diagnosis of all of the claims that they say were fraudulently upcoded by diagnosis code. And if you look at the number of fraudulent claims they say were submitted, the highest one is 103. That is 103 claims over seven years from 34 hospitals. That works out to each hospital submitting a claim with this diagnosis combination once every two years. The question about whether that is possibly because of better coding once every two years, when that patient presents, or that is a fraud scheme applied in a very, very sparing form, I think is a real reason to look for something more. Ms. Elsworth, let me ask you. What if Integra had presented statistics that indicated that Providence was submitting MCC codes at 50 times the national average? Would that be enough without more to allow us to infer fraud under rule 8? Again, Your Honor, I think that when you're getting into using statistics to try and prove causation, you're on very sort of shaky territory. Are you saying you could never do that? No, I'm not saying you could never, but I'm saying it's certainly harder. And there may be circumstances like the one Your Honor has identified that get closer to the situation in Victaulic, which is the only court that has allowed statistics to be used to allow a complaint to go forward. In that case, you had specific facts, though, about one of the inputs, how much pipe a company was reporting, and then you had specific facts about the output. That pipe, once it was being sold, was not identified with a foreign place of origin, even though it had been imported. So the combination of those pictures of the pipes for sale, the shipping manifest, and the data analysis that an expert did were something that two of three judges on the Third Circuit thought were sufficient to allow the complaint to go forward. In doing that, the Third Circuit did something that is different from this court. This court has said in the EBID case that an outsider does not get extra benefit of the doubt or a lower pleading standard. They don't get an easier path because they're an outsider. But the Third Circuit, in letting that statistical case go forward, said because they're an outsider, we're going to give them some benefit of the doubt. If I can go back to the news media question for just a moment. It looks like you're encouraging the court to adopt a very sweeping definition of news media. What is your best authority that your definition fits within the ordinary meaning of the phrase? So, Your Honor, we provided at page 48 of our brief a dictionary definition of news and media that we think are consistent with the way the court approached defining terms in both Schindler Elevator and in the Graham County case where it focused on the fact that the public disclosure bar, the trigger for it, is wide, it's broad, and then it serves essentially a funneling effect where if someone is an original source, if the government vetoes the use of the public disclosure bar, or if the government wants to go forward, they can. But the definition that we offered we think is the one that's consistent with the definitions of news and media as they occur in sort of an ordinary understanding. And they avoid raising the problems that the Supreme Court focused on. For example, in Schindler, when it tried to figure out if there was a narrower way to define report, it would have excluded other things that were necessarily reports, and there was no principled basis for drawing a distinction. We think that's the situation here. It's difficult to find a principled basis why when you do a Google search, one answer that comes up would trigger the public disclosure bar, but you click on the very next link and it wouldn't. The statutory touchstone tended to be whether there was a public disclosure, and that's what the court said in Schindler and Graham County. Do you want to save any of your time for rebuttal? It's entirely up to you, but you got a little over two and a half minutes, a little under. I'd be happy to save the remainder for rebuttal unless the court has further questions at this point. Any questions by my colleagues at this point? No, thank you. Very well. All right, so Jeremy Hobner, please. Jeremy Hobner-Wells, I apologize. Thank you, Your Honor. I just want to flag to the court before I begin that I lost my power in the waiting room, and I'm afraid it might happen again, and so I have the number standing by. Very well. Your Honor, the defendants have fought hard in this case to make it all about the statistical analysis while ignoring the literally dozens of paragraphs in the complaint that sets out the factual details of the scheme. Now, relying on Victaulic as well as this court's Rule 9b standard as it applies to FCA cases, the district court rightly held that statistical analyses can be sufficient to show reliable indicia of the submission of false claims when coupled with factual allegations that outline the nature of the alleged fraudulent scheme, and that's exactly what the relator did here. Mr. Waltz, why should we not go the way of the Fifth Circuit here? Your Honor, I think that has obviously been a large focus of the briefing here, and I would make two points. I think the Ninth Circuit has interpreted the alternative explanation language from Twombly and Iqbal in a couple of cases, and I think you can boil it down to two steps. And the first is to ask whether or not the alternative explanation set out by the defendants is so obvious that it warrants further examination under Rule 8. Now, the Baylor court found that the analysis that integrates statistical analyses triggered this obvious explanation or, excuse me, this alternative explanation language from Twombly and Iqbal, and it did so based on three cherry-picked graphs from the complaint that the court in that case said showed the trend of the defendant hospitals and their peer hospitals converging, so that the court said that you could read into that that the defendants are simply ahead of the game and that all hospitals are merging to roughly similar paths. What is your best argument, counsel, that the complaint, when read as it is supposed to be, contains no viable explanation that would be lawful? Well, so the graphs that I was talking about, that the Fifth Circuit focused on, was their interpretation of those graphs that they said showed perhaps a lawful explanation, but that explanation by the Fifth Circuit actually doesn't even hold in this case. Particularly for one diagnosis, severe malnutrition, the gap between the defendants in this case and their peer hospitals is actually now significantly wider than it was in 2011, and the other two diagnoses, the gap remains the same, and it's the gap between the defendant hospitals and their peer hospitals that the relator alleges demonstrates the misconduct by the defendants. Counsel, when you say the gap, is that the raw data gap or the proportional gap? In other words, if it goes from 4 to 2 to 10 to 7, the proportion's gone down, but the gross gap has gone up. Which are you focusing on? It would be proportional, right? So the trend that you see in the graphs going up demonstrates that perhaps the defendants are right, that all hospitals are getting better at capturing MCCs, but the gap between the defendants and their peer hospitals is what shows that there's a significant difference, and remember that Integra built into its analyses a conservative limitation, only looking at diagnoses where the defendants used them significantly more than their peer hospitals. Counsel, let me put at least my concern to you this way. You've done a wonderful job of scraping large amounts of data, but we know that if you take large amounts of data and look at many, many diagnoses over many, many times, some of them are going to be considerably different than others. You have a theory that whoever's at the high end must be the fraudster. They have a theory that somebody's got to be at the high end, and we're good at it. And so my question is, what have you done that's just more than set up this matrix and push a button and sue whoever is at the high end? You've identified 125 cases. I didn't see that for any of those you've said, and here's what they did wrong. Here's this guy, and he was big and healthy, and they called him severely malnourished, or here are these three people that were ordinary. So other than scraping the data, what have you got to support your hypothesis? Right, and so I think you're getting at I think the second reason that we think the Baylor court got that decision wrong and why this court should hold differently here, which is looking toward the factual allegations in the complaint. Again, dozens of paragraphs that tend to refute the alternative explanation that they're simply better than everybody else. And those are what, other than the JADA, we're the greatest coders in the world. I recognize you've got a lot of good stuff there, but I don't see a single thing that relates to a real human being's case. So when you say you have other things, is there anything other than the JADA discussion? So obviously this court and most courts around the country have rejected the ruling out of the Eleventh Circuit that specific instances, specific patients have to be alleged in the complaint. All that is required is reliable indicia that false claims were submitted. And the reliable indicia in this case would be the statistical analyses, but informed by the factual analyses. So you look at in particular, so I'll highlight one example, the documentation tips or training materials that are cited in the complaint that push specific MCCs, the same MCCs that relate in many cases that the relator identified in the complaint as being misstated. They refer to these MCCs as pearls for documentation. And at the same time, these training materials discourage diagnoses that don't warrant MCCs and would be less profitable to the defendants. And I would also point out that the defendants all but ignore the fact that the complaint is also largely based on interviews of witnesses, former employees of the defendants and the defendants' clients that not only confirm the relator's interpretation of this documentary evidence, but confirm the nature of the scheme, particularly with regard to the use of leading queries and the use of leading queries in particular to push the specific diagnoses identified by Integra regardless of clinical, whether it's warranted clinically and focus entirely on its impact on Medicare revenue. But counsel, isn't my colleague Judge Boggs correct that despite the mountain of statistical evidence that you have provided, that there really is nothing in the complaint that ties that data to specific human beings? And isn't it necessary for us if we're going to analyze whether good versus bad claims are made to have some understanding of what happens to individual human beings to whom these statistical data refer? Right. So I think it would often be the case that an insider relator or an outsider relator isn't going to have enough access to be able to name names, to be able to name specific patients whose diagnoses were misrepresented. And that's the reasoning behind the standard adopted in this circuit, as well as around the country, that says that you don't need to identify specific false claims so long as you can set out what is the nature of the scheme, and then also reliable indicia to support the allegation that false claims were indeed submitted without stopping short of actually identifying specific patients and specific claims. The 125 that you identify, are they – and help me here. Just as I read it, I didn't find them being any different in some nature than the, you might say, the much larger statistical set. It did enable you to point to some specific claim numbers, but I didn't say where you said these 125 as a group are from a certain hospital or from a certain ethnic group or something that made them any different than everyone else who had that diagnosis. Did I miss that? You did not miss it. Those 125 claims are 125 claims that are statistically likely to have misrepresented MCCs. And the district court found that looking at the statistics alone, applying the standard of this circuit, the statistics alone wouldn't support a claim. And that's because – but if those 125 patients, if we had the medical records and we could show those were indisputably false claims, it might not be enough. But the problem that the defendants have here is that when you couple the statistical likeliness of the submission of false claims that's demonstrated by Integra's analyses with the specific factual allegations, and again, dozens of paragraphs, a three-pronged scheme of aggressive training, pushing specific MCCs, leading queries, pushing specific MCCs, incentives and disincentives offered to employees, pushing specific MCCs. If you didn't have that, you might not have a claim. But the thing is the complaint sets that out in great detail. And it's based on the defendant's internal documents and witness interviews as well. How do you distinguish between those folks and others who, even though there's an aggressive training and so on, are just trying to maximize profit but in a lawful way? Well, I mean, I think the documentary evidence which is confirmed, the interpretation of which – Relator's interpretation of which is confirmed by witness interviews, so the very type of insider knowledge that the defendant's claim is lacking from the complaint but really isn't. Sorry, what do you mean by witness interviews? Just help me here. Somebody said we miscoded? The data that we're dealing with JADA, that is, I didn't see any witness interview who said, oh yes, I miscoded this deliberately or I was told to miscode this deliberately. Yes, so the witness interviews that I'm referring to is that in connection with their investigation, the Relator conducted multiple interviews of the defendant's former employees and former employees of the defendant's clients. And they gave – they didn't give specific names of patients, but they gave specific information about how this scheme was orchestrated. Defendant's clients, who do you mean? Like doctors that work at the hospitals? Oh, I'm sorry. I mean JADA clients. Oh, JADA clients. Yeah, yeah, yeah. You're not suing JADA here. No, we are suing JADA as well as the defendants. But it's only through what's happened with the hospitals. Right. Let me ask you this, counsel. Sure. Obviously, you have the data and there is this curve and Providence is out at this end. The next hospital just below Providence, if they also use JADA, are they not equally plausibly liable? If there are no factual allegations, if the Relator was unable to obtain or discover factual allegations that suggest that they were engaged in a fraudulent scheme to misrepresent MCCs, then no. But unfortunately for the defendants in this case, there is that. But most of what you have is about JADA's practices that are on their website, that are puffing, if we want to use that term, about how great we are at this. I would think anybody dealing with JADA would be at some considerable risk. Well, I would push back on that a little bit, respectfully, Your Honor, to say that I think, you know, look at one of the key documents, the documentation tips, which are training materials. They're not puffery. They're not marketing materials. They're training materials for doctors of JADA's clients that specifically are pushing the… Doctors of JADA's clients, which would be any other hospital that uses JADA. Right. But also Providence. These documents were found, I believe, on Providence's website. And on top of that, you have defendants, former employees saying, with regard to the leading query side of this scheme, that doctors would say, and I'm quoting now, doctors will just say whatever you ask them to say just to get you off his back. And it's that type of specific allegation, that type of specific nature of the scheme on which this whole complaint is based. It's not just the statistical analyses, although those are very important, too, to demonstrate, as I mentioned, the reliable indicia of the submission of false claims. You're almost out of time. Let me ask my colleagues if either has a question. I have a question because we're not just looking at Rule 8 here. We're also looking at Rule 9B. And it looks like the district court concluded the how from Rule 9B is basically by the training, you know, doctors to use language supporting the MCCs and steering them into using that language through leading queries and incentives. But I guess isn't that allowed so long as the diagnosis is supported by the medical record? Do you have any evidence of a providence doctor actually submitting a claim that is unsupported by the medical record? Well, again, I would go back to the requirement that you don't have to allege specific claims. But more to your question, the knowing, the scienter aspect in the FCA, the knowing, the word knowing in the FCA extends to reckless behavior, reckless disregard for the accuracy of the coding, right? And so here we're saying that this scheme showed that the defendants' efforts to push these specific MCCs were without regard to the accuracy of the diagnosis and specifically focused on the impact on Medicare and the impact of Medicare revenue. Now, as for whether that resulted in the submission of false claims, that's precisely what Integra's analyses show, that they used these MCCs far in excess of their peer hospitals, demonstrating reliable indicia that this scheme worked, that they did submit MCCs regardless of whether they were actually won. Other questions? No, thank you. How about you, Judge Boggs? Very well. Thank you very much, Mr. Wells. So, Ms. Ellsworth, you have some time left. Ms. Ellsworth, I'm sorry to impose on your time, but can you respond right now to what Mr. Wells just said regarding the witnesses or the witness interviews that said the witnesses said the doctor said just put down anything? Why doesn't that lend support to allowing this complaint to go forward? So, Your Honor, I heard my friend on the other side say that the complaint was, quote, largely based on these witness interviews. I invite the court to look at pages ER 53 to 54. There are six statements in the complaint total that are attributed to interviews. Not a single one of them includes any facts about any Providence doctor inserting any false diagnosis. The one he referenced about someone saying a doctor would say anything to just get the coders off his back was not from a Providence hospital. The statement that's in there that's completely vague about leading queries does not contain a single example of a leading query. And on page 32 of Integra's appellate brief, it agrees that it does not allege any instance in which a query was not validly rooted in a medical record. If a query is validly rooted in a medical record, it is not leading. You can see that by referring to the AHIMA guidance, the industry guidance on leading queries, which is at ER 231 and ER 252. So the reliance on interviews in the appeal brief is completely disconnected to the way this case was argued in the complaint and the way this case was argued below. The second thing that Mr. Wells talked about were some of the documents, like the tip sheets. I'd invite the court to look at the tip sheets too. They're found at ER 337 to 347. Each of the four in the record says as its first bullet point under secondary diagnoses, quote, include all diagnoses which are treated or monitored. Nothing in here that says write something down if your patient doesn't have it. And in fact, they discuss 24 different complications and comorbidities, not just the three that are at issue in this case. There's no context about how these were distributed, something that was said when they were distributed that would say they don't mean what they say on their face. This is training material for doctors. The copyright date is 2012 on them. These were prepared as clinical documentation improvement was picking up speed because CMS had changed the reimbursement scheme. Judge Boggs, you're exactly right to point out that there is no basis to say that any of those 125 claims that are identified in the complaint are false. That's why the Baylor court called that description completely conclusory. There was no medical record review. There was no patient review. There was none of the information that would be necessary to do that. Counsel, I ask this question, obviously you're not under any obligation to make the other side's case, but when you say that the tip sheets included 24 diagnoses to be monitored, did you ever look at yourself and see whether some or any or many of those other 21 you were not at the very top of so that the three were cherry-picked? Or is it simply they scraped the data and those were the three that they focused on? Your Honor, we don't have the national Medicare claims data that the relator used to conduct its analysis. Why not? I mean, if that is a public record, I'm not saying you had to, but is there some reason they could get it and you couldn't? Certainly, Your Honor. They applied for it. They asked the government. They asked CMS to provide it to them, and CMS did. That's what makes it a public disclosure as to them. Not getting into that. Okay, I hear your point. That's fine. Go ahead. Okay, I have just two more points left to make, Your Honor. You're out of time, but he did very quickly. Go ahead. I'll limit it to one point then, Your Honor, which is that, Judge Murgia, you asked about whether we were asking for a broad rule for the public disclosure bar. There is a narrower avenue available to this court, which is what we argued originally below, and we would be perfectly happy for this court to address too, which is simply to look at the defendant's websites and the industry websites and not issue a ruling that speaks any broader than to those specific websites that are at issue. That is what courts have typically done when Internet materials have come up, and we would be perfectly happy with that. So, for all of these reasons and the reasons in our brief, we ask the court reverse the decision below and direct that this complaint be dismissed. Very well. Thank you, counsel, both of you. We appreciate it. The case of Integra Medical Analytics LLC v. Providence Health and Service is now submitted.
judges: Boggs, M. Smith, Murguia